ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| MARIO MANCERA<br>Apelante<br><br>v.<br><br>DAVID MICHAEL SMITH Y OTROS<br>Apelado | KLAN202500129 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Guaynabo<br><br>Caso Número:<br>GB2024CV00294<br><br>Sobre: Desahucio, Cobro de Dinero Ordinario y Otros |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y la Juez Barresi Ramos

Rivera Marchand, Jueza Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 23 de mayo de 2025.

Comparece el señor Mario Mancera (señor Mancera o apelante) y nos solicita que revoquemos la *Sentencia* notificada el 10 de febrero de 2025 por el Tribunal de Primera Instancia, Sala Superior de Guaynabo (TPI o foro primario). Mediante dicho dictamen, el TPI declaró No Ha Lugar la demanda de desahucio sumario y cobro de dinero, incoada por el apelante contra el señor David Michael Schmitt (señor Schmitt)[1] y DMS Management Group of PR, LLC (DMS), (en conjunto, apelados).

Por los fundamentos que exponemos a continuación, se confirma en parte y se revoca en parte el dictamen apelado.

### I.

El 5 de abril de 2024, el señor Mancera instó una demanda de desahucio y cobro de dinero contra el señor Schmitt, la cual fue posteriormente enmendada para incluir a DMS.[2]

---

[1] Según surge del contrato de arrendamiento original y de otros documentos en el expediente, el apellido del representante de la compañía DMS Management se escribe Schmitt en lugar de Smith.
[2] Apéndice, págs. 1-10 y 15-18, *Contestación a moción y Solicitud de Enmienda a la Demanda*. De la Entrada 4 en el expediente electrónico del portal del Sistema

Número Identificador

SEN2025_____

De las alegaciones de la demanda se desprende que, el señor Mancera le arrendó una propiedad sita en el Condominio Centro Internacional de Mercado, Torre Uno (I), séptimo (7mo) piso, oficina 712 en Guaynabo, Puerto Rico, a DMS mediante contrato intitulado *Lease Agreement,* suscrito el 1 de febrero de 2021, con efectividad del 15 de febrero de 2021 hasta el 15 de febrero de 2023. En el contrato surge que, KW Grand Homes KellerWilliams Lic. 119, sirvió de agente de bienes raíces en el negocio jurídico. A esos efectos, pactaron que cualquier renovación debería ser por escrito y por conducto de los servicios de KW Grand Homes. Según las cláusulas del contrato, DMS, representado por el señor Schmitt, tendría derecho a la posesión al inmueble en concepto de arrendador a cambio de un pago de $2,500.00 mensuales.

Así las cosas, el 14 de febrero de 2023, las partes suscribieron un *Addendum Al Contrato De Arrendamiento*. De lo antes, se desprende lo siguiente:

> This addendum will be part of and be incorporated to the lease with option to buy agreement signed on February 11, 2022. To include or modify the following terms and conditions:
>
> The parties agree to extend the lease with option to buy agreement for (1) year, from February 15, 2023 until February 15, 2024.
>
> As per the lease with option to buy agreement signed on February 11, 2022 all terms and conditions will remain the same.
>
> DMS of PR LLC will lease the property with an end date on or before May 30th 2025 with an option to purchase at the price of $275.000.
>
> For every month of the $2,500 monthly lease; $850.00 will be applied to the purchase as a down payment until the purchase of the property is closed.
>
> Lessee will pay the 2022 lease year 10 months in advanced and will receive 2 months free of charge. The Landlord agrees to give the Lessee the option to also pay 10 months in advanced and receive 2 months free of charge for any additional years the property remains leased by the Lessee.[3]

---

Unificado de Manejo y Administración de Casos (SUMAC) del Poder Judicial surge la *Demanda Enmendada* como anejo a la moción antes referida.
[3] Apéndice, pág. 10.

Conforme surge de las alegaciones de la demanda, en febrero de 2024, la parte demandante le envió a la corredora de bienes raíces una carta mediante la cual informó que no iba a renovar el contrato de alquiler. A tales efectos, le concedió un término de dos (2) meses, sesenta (60) días, para que desalojara la propiedad. Adujo que, la parte demandada pagó de manera tardía el canon de arrendamiento correspondiente a febrero de 2024 y había satisfecho la cantidad pertinente al mes de marzo de 2024. Expuso que, le debía una cantidad de las rentas acumuladas más el recargo de $125.00, cada vez que se realizaba un pago tardío. Sostuvo que, sus intentos de resolver la situación directamente y por conducto de su representante han sido infructuosas, por lo que, solicita al foro primario que -por la vía sumaria- ordene el lanzamiento de los apelados de la propiedad y el pago de lo adeudado, más costas y honorarios de abogado.

En reacción, los apelados presentaron su alegación responsiva junto a una reconvención en la que planteó que, mediante la enmienda al contrato, las partes se comprometieron a aplazar la opción de compra a mayo de 2025.[4] Arguyeron que, DMS tenía la intención de ejercer su opción de compra, pero que aceptó aplazarlo debido a que el señor Mancera y su cónyuge, Gloria Sortillón (señora Sortillón), les informaron que enfrentaban un proceso de quiebra. Se desprende de este escrito también que, según los apelados, el señor Mancera y la señora Sortillón no deseaban formalizar la compraventa. En su consecuencia, solicitó remedios ante el presunto incumplimiento de contrato de la opción de compraventa por parte del apelante. En particular, suplicó que el TPI se expresara mediante una sentencia declaratoria para así determinar que, DMS y el señor Schmitt deben cumplir con la opción de compraventa mediante escritura. El señor Mancera acreditó su

---

[4] Apéndice, págs. 41-46.

contestación a la reconvención en la que planteó que se desestimara la acción por ser improcedente y por falta de parte indispensable.[5]

Cabe destacar que, el 29 de mayo de 2024, DMS solicitó la conversión del trámite de sumario a uno ordinario, debido a la presentación de una reconvención y así lo autorizó el TPI en la misma fecha.[6] Oportunamente, el señor Mancera presentó una reconsideración por entender que, el TPI debía autorizar un pleito separado para el incumplimiento contractual alegado y continuar la acción de desahucio por la vía sumaria.[7] Igualmente, produjo una segunda moción en oposición a la solicitud de desestimación parcial incoada por DMS, bajo el fundamento de que fragmentaría el proceso y solicitó que se celebrase, lo antes posible, la vista de desahucio.[8] Evaluado lo antes, así como las mociones adicionales, el TPI denegó el petitorio del apelante.[9]

Así las cosas, el 23 de agosto de 2024, los apelados solicitaron que el tribunal ordenase que el señor Mancera pagara las cuotas de mantenimiento y utilidades porque les suspendieron el servicio de energía eléctrica.[10] Con esta solicitud, anejaron un estado de la cuenta (*Statement)* que contenía el desglose de los balances de la cuota de mantenimiento y utilidades desde el mes de marzo hasta agosto de 2024; este documento plasmó que había un balance de $6,787.78 en cuotas de mantenimiento y utilidades, y que se implementó una penalidad en el mes de agosto.[11]

En desacuerdo, el señor Mancera adujo que, incumplió con el pago de cuotas de mantenimiento y utilidades porque el señor Schmitt y DMS debían varios cánones de arrendamiento y que, el referido contrato no estaba vigente porque se les había indicado a

---

[5] Apéndice, págs. 53-59.
[6] Apéndice, págs. 38-40, 47.
[7] Apéndice, págs. 48-52.
[8] Apéndice, págs. 60-66.
[9] Apéndice, pág. 70.
[10] Apéndice, pág. 77.
[11] Apéndice, pág. 78.

los apelados que el apelante no tenía la intención de renovarlo.[12] Para ilustrar sus alegaciones, incluyó una tabla en el escrito sobre los cánones adeudados, la cual indicaba que no se realizaron los pagos de mayo, julio y agosto de 2024 y que el pago correspondiente a junio de 2024 se hizo tardíamente. Asimismo, solicitó una vez más que se celebrara la vista del desahucio.

Los apelados plantearon que, el contrato estaba vigente hasta, en o antes del 30 de mayo de 2025, y que era responsabilidad del señor Mancera realizar los pagos correspondientes a las cuotas de mantenimiento y las utilidades.[13] Nuevamente, el señor Mancera se opuso y reiteró su postura el 20 de septiembre de 2024.[14]

Pendiente lo anterior, el señor Mancera solicitó la desestimación de la reconvención. En esta, alegó que, como la reconvención se adentraba en distinto asuntos que rebasaban el ámbito de actos de administración, era necesario incluir a la señora Sortillón y a la sociedad legal de gananciales en el pleito.[15] Al no hacer esto y transcurrir el término de 120 días que se tenían para emplazar a las partes, arguyó que, procedía la desestimación de la reconvención por falta de parte indispensable. A lo antes, los apelados se opusieron[16] y luego, el señor Mancera replicó el 10 de diciembre de 2024.

Evaluado lo anterior, el foro primario declaró ha lugar el petitorio dispositivo y, en su consecuencia, desestimó sin perjuicio la reconvención incoada por DMS, por falta de parte indispensable mediante una *Sentencia Parcial*, notificada el 4 de febrero de 2025[17] provocando así que, el proceso y la naturaleza de la causa instada,

---

[12] Apéndice, págs. 79-86.
[13] Apéndice, págs. 90-92
[14] Apéndice, págs. 94-96.
[15] Apéndice, págs. 97-105.
[16] Apéndice, págs. 118-122.
[17] Apéndice, págs. 132-133.

retornara a su condición original correspondiente a un caso de desahucio por la vía sumaria.[18]

A la vista en su fondo comparecieron las partes junto a sus representantes legales y testificaron el señor Mancera[19] y el señor Schmitt.[20] Justipreciada la prueba testifical y documental, el TPI dictó la *Sentencia* notificada el 10 de febrero de 2025. En esta, consignó las siguientes determinaciones de hecho:

1. El Sr. Mario Mancera, la Sra. Gloria Sortillón y su sociedad de gananciales son los titulares de la Suite 702, del Centro Internacional de Mercadeo I, en Guaynabo.
2. Mediante contrato de arrendamiento suscrito el 1 de febrero de 2021, arrendaron el inmueble a DMS Management Group, representado por David Schmitt.
3. El contrato de arrendamiento tenía una extensión del 15 de febrero de 2021 al 15 de febrero de 2023.
4. El canon de arrendamiento ascendía a $2,500.00 mensual. No obstante, proveía para el pago adelantado y englobado de diez meses, al comienzo de cada año del contrato. En este supuesto, se dispensaba del pago correspondiente a los dos meses restantes.
5. En el contrato, el arrendador se comprometió al pago de las cuotas de mantenimiento y utilidades.
6. En septiembre de 2021, las partes suscribieron contrato de opción de compraventa, respecto al inmueble objeto de arrendamiento. Pactaron un precio de compraventa de $275,000.00 y, conforme el acuerdo, DMS abonó $11,000.00.
7. DMS intentó finalizar la compraventa, pero el señor Mancera indicó que debía aguardar a que se obtuviera el descargue de las obligaciones en el proceso de quiebra que enfrentaba la señora Sortillón.
8. En febrero de 2022, suscribieron *addendum* al contrato de opción de compraventa, a la espera de la culminación del proceso de quiebra.
9. El *addendum* al contrato de opción establece que DMS arrienda la propiedad hasta el 30 de mayo de 2025, con opción de compra por $275,000.00 ("DMS of PR LLC will lease the property with an end date on or before May 30th[,] 2025 with an option to purchase at the price of $275,000").
10. El *addendum* al contrato de opción dispuso que $850.00, de cada pago mensual de $2,500.00 de canon de arrendamiento, sería destinada a crédito a aplicarse en el cierre de la compraventa del inmueble.
11. El 14 de febrero de 2023, las partes suscribieron *addendum* al contrato de arrendamiento. Si bien un acápite establece que se extiende el contrato de arrendamiento del 15 de febrero de 2023 al 15 de febrero

---

[18] Apéndice, pág. 136.
[19] Como prueba se presentaron los siguientes documentos: Exhibit I-Contrato de arrendamiento (lease agreement); Exhibit II-Addendum al contrato de arrendamiento; Exhibit III-carta del licenciado Chávez del 24 de febrero de 2024, dirigida a Paola Mendiola, corredora de bienes raíces; Exhibit IV-correos electrónicos del 9 de diciembre de 2024 del licenciado Chávez a la licenciada Morales.
[20] En el desfile de prueba se presentaron los siguientes documentos: Exhibit I-Contrato con Opción a Compraventa; Exhibit II-Addendum al Contrato de Opción de Compraventa y Exhibit III-Recibos del Chase Bank.  Véase Entrada 69 en SUMAC. Minuta del 4 de febrero de 2025.

de 2024, acto seguido reitera que DMS arrienda la propiedad hasta el 30 de mayo de 2025, con opción de compra por $275,000.00.

12. El *addendum* al contrato de arrendamiento también contempla la figura del pago adelantado y englobado de diez meses, con ahorro de dos meses, con referencia a años de arrendamiento plural.

13. En atención a la imbricación del arrendamiento y la opción de compraventa, en el *addendum* al contrato de arrendamiento se reiteró que $850.00 de cada pago mensual de $2,500.00 de canon de arrendamiento, sería destinado a crédito a aplicarse en el cierre de la compraventa del inmueble.

14. DMS no ha podido concretizar la compra del inmueble, por motivos atribuibles a la parte arrendadora-vendedora.

15. La parte arrendadora-vendedora se retractó en su interés de vender la propiedad.

16. En el verano de 2024, la parte arrendadora comenzó a incumplir su obligación contractual de realizar los pagos de cuotas de mantenimiento, por lo que se interrumpió el servicio de electricidad del inmueble, por el periodo del 5 de agosto al 17 de septiembre de 2024.

17. DMS se vio en la obligación de realizar los pagos de las cuotas de mantenimiento adeudados y siguientes. Efectuó pagos de $875.09 mensual, retroactivo al mes de julio de 2024. Por consiguiente, ha abonado la suma de $7,000.72 por concepto de cuotas de mantenimiento, partida que correspondía contractualmente a la parte arrendadora.

18. La parte arrendadora reclama un balance al descubierto por cánones de arrendamiento de $7,500.00, a razón de $2,500.00 por tres meses. Ahora bien, la parte arrendataria evidenció tener un crédito de $7,000.72 por concepto de cuotas de mantenimiento que se ha visto en la obligación de satisfacer. A su vez, cuenta con un crédito de $11,000.00 por depósito de opción de compraventa. De igual forma, necesario dar consideración a la figura contractual contemplada del crédito mensual de $850.00, aplicado a la futura compra de la propiedad, en función desde febrero de 2022.

19. El contrato de arrendamiento está vigente hasta el 30 de mayo de 2025.

20. Contrario a la contención de la parte arrendadora, son el señor Mancera, la señora Sortillón y su sociedad de gananciales quienes adeudan a DMS. [21]

Basado en lo antes, el TPI declaró No Ha Lugar a la demanda sobre desahucio sumario, y cobro de dinero incoada por el señor Mancera. Sin embargo, y a pesar de haber desestimado la reconvención, el TPI consignó en su dictamen expresiones y conclusiones atinentes a los acuerdos entre las partes, así como, hizo determinaciones sobre los presuntos incumplimientos correspondientes al contrato de opción de compra y la procedencia de reclamaciones a favor de la parte recurrida.

---

[21] Apéndice, págs. 137-139.

Inconforme, el señor Mancera acude ante esta Curia y señala la comisión de los siguientes errores:

Erró y abusó de su discreción el foro de instancia al dictar sentencia mediante la cual desestima la demanda aduciendo la imbricación del arrendamiento y la opción de compraventa, en el *Addendum* al contrato de arrendamiento se reiteró que $850.00 de cada pago mensual de $2,500.00 de canon de arrendamiento, sería destinado a crédito a aplicarse en el cierre de la compraventa del inmueble.

Erró y abusó de su discreción el foro de instancia al no resolver la solicitud de desahucio sumario independientemente de otras causas de acción no presentadas en la demanda.

Erró y abusó de su discreción el foro de instancia al imbricar la obligación contractual de realizar los pagos de cuotas de mantenimiento, por lo que se interrumpió el servicio de electricidad del inmueble, por el período del 5 de agosto al 17 de septiembre de 2024 con la acción de desahucio sumario.

Erró y abusó de su discreción el foro de instancia al concluir "que la parte arrendataria evidenció tener un crédito de $7,000.72 por concepto de cuotas de mantenimiento que se ha visto en la obligación de satisfacer. A su vez, cuenta con un crédito de $11,000.00 por depósito de opción de compraventa. De igual forma, necesario dar consideración a la figura contractual contemplada del crédito mensual de $850.00, aplicado a la futura compra de la propiedad, en función desde febrero de 2022." Acciones todas ellas ajenas al desahucio sumario.

Erró y abusó de su discreción el foro de instancia al concluir que "si bien el *Addendum* al contrato de arrendamiento entremezcla dos fechas, de forma aparentemente incompatible, la lectura integral de sus cláusulas, consecuente con la intención de las partes, es que se arrendaba hasta el 30 de mayo de 2025, con opción de compra. Obsérvese que ambos *addendums* coinciden al establecer que "DMS of PR LLC will lease the property with an end date on or before May 30th, 2025 [sic] with an option to purchase at the price of $275,000." Cuando lo cierto es que el contrato de arrendamiento está finalizado y el arrendatario está en precario. Es una acción separada del desahucio sumario la reclamación por incumplimiento del contrato de opción de compraventa.

Pendiente lo anterior, emitimos una *Resolución* el 3 de abril de 2025, al amparo de la Regla 83.1 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XII-B, R. 83.1. En esta, ordenamos al Juez, Hon. Julio De La Rosa Rivé fundamentar su sentencia. En particular, sobre la determinación de hecho número 15 y la aplicación de la cláusula número 17 del contrato suscrito por las partes, conforme a la prueba oral y documental admitida ante su consideración. Lo antes, en aras de exponer los fundamentos

atinentes a la vigencia del contrato en disputa y así la adjudicación de la causa de acción sobre desahucio sumario.

El Honorable Juez acreditó cumplimiento en su *Comparecencia Especial* el 10 de abril de 2025, a la cual reaccionaron ambas partes en sus escritos presentados el 24 y 25 de abril de 2025, respectivamente.

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

**II.**

**A. El desahucio**

Como se sabe, la acción de desahucio es un procedimiento especial de naturaleza sumaria cuyo fin principal es recuperar judicialmente la posesión material de un inmueble. *SLG Ortiz-Mateo v. ELA,* 211 DPR 772, 799 (2023).[22] Esto se hace mediante el lanzamiento o expulsión del arrendatario o precarista que la ocupa. Artículo 621 del Código de Enjuiciamiento Civil de Puerto Rico, 32 LPRA sec. 2822; *Cooperativa v. Colón Lebrón,* 203 DPR 812, 820 (2020); *Mora Dev. Corp. v. Sandín,* 118 DPR 733, 749-750 (1987); *Turabo Ltd. Partnership v. Velardo Ortiz,* 130 DPR 226, 241-245 (1992). La acción de desahucio está reglamentada por el Artículo 725 del Código Civil de Puerto Rico de 2020, 31 LPRA sec. 7863, y por los Artículos 620-634 del Código de Enjuiciamiento Civil, 32 LPRA secs. 2821-2838. Su objetivo es devolverle la posesión de hecho de un inmueble al dueño mediante el lanzamiento o expulsión del arrendatario o precarista que detenta la propiedad sin pagar el canon correspondiente. *SLG Ortiz-Mateo v. ELA, supra,* págs. 799-800, citando a *ATPR v. SLG Volmar-Mathieu,* 196 DPR 5, 10 (2016).

---

[22] El desahucio no es una de las formas de terminar el arrendamiento, sino un medio para recobrar judicialmente el inmueble arrendado cuando aquel se acaba por la concurrencia de ciertas causas extintivas. Esta acción tiene un carácter resolutorio del contrato. *Mora Dev. Corp. v. Sandín, supra,* págs. 741-742, n. 6.

Cabe señalar que, la acción de desahucio se tramita sumariamente, en respuesta al interés del Estado de atender con prontitud la reclamación del dueño de un inmueble de recobrar la posesión y disfrute de su propiedad. *Íd.,* citando a *Cooperativa v. Colón Lebrón, supra,* pág. 820. Cónsono con lo anterior, la Ley Núm. 86-2011 enmendó el Artículo 629 del Código de Enjuiciamiento Civil, 32 LPRA sec. 2831, con el objetivo de reducir el término para apelar una determinación del tribunal que autoriza el desahucio. A esos efectos, el Artículo 629 del Código de Enjuiciamiento Civil, *supra,* dispone:

> [l]as apelaciones deberán interponerse en el término de cinco (5) días, contados desde la fecha de archivo en autos de la notificación de la sentencia, por las partes perjudicadas por la misma o sus abogados.

Sobre la naturaleza sumaria de la acción de desahucio, el Tribunal Supremo ha expresado que:

> [l]a característica medular de un procedimiento civil sumario es lograr, lo más rápido y económicamente posible, la reivindicación de determinados derechos, reduciendo al mínimo constitucionalmente permisible el elenco de garantías procesales. Conlleva acortar términos -en ocasiones, hacerlos improrrogables- y prescindir de ciertos trámites comunes al proceso ordinario sin negar al demandado o querellado una oportunidad real de presentar efectivamente sus defensas. Se acepta que estos procedimientos sumarios, en el fondo, constituyen unos tratos privilegiados y que su justificación responde a un interés gubernamental legítimo de atender prioritariamente ciertas causas de acción. Por ser la excepción, su aplicación está limitada a situaciones expresas en que la Asamblea Legislativa ha reconocido la necesidad y trascendencia de reparar, en un breve plazo, algún agravio. *Turabo Ltd. Partnership v. Velardo Ortiz, supra,* pág. 234.

Tal proceder sumario ha permitido limitar y acortar ciertos términos y prescindir de algunos trámites comunes al proceso ordinario, sin que ello conlleve el suprimir o menoscabar la oportunidad del arrendatario de levantar con efectividad sus defensas durante el litigio. *Mora Dev. Corp. v. Sandín, supra,* pág.

752; *Turabo Ltd. Partnership v. Velardo Ortiz, supra,* págs. 235, 245.[23]

Sin embargo, esta acción se puede tornar ordinaria con la presentación de defensas afirmativas. *Mora Dev. Corp. v. Sandín, supra,* pág. 747-748, 752*; ATPR v. SLG Volmar-Mathieu, supra,* pág. 10, citando a *Jiménez v. Reyes,* 146 DPR 657, 661 (1998). Pese a lo anterior, es posible acumular una acción de cobro de dinero por el impago de cánones de arrendamiento sin que se torne ordinario el pleito. 32 LPRA sec. 2829; *ATPR v. SLG Volmar-Mathieu, supra,* pág. 10. Por último, es importante recalcar que, en un proceder como ese, la aceptación de algún canon durante el procedimiento de desahucio equivale a su renuncia porque esta es la razón para la causa de acción. *Igartúa v. Ruiz,* 73 DPR 354, 357 (1952).

### B. Apreciación de la prueba

Como regla general, los tribunales apelativos aceptan como correctas las determinaciones de hechos de los foros inferiores, sin intervenir con la apreciación y la adjudicación de credibilidad que realiza el juzgador de los hechos en relación con la prueba testifical. *Pueblo v. Negrón Ramírez,* 213 DPR 895 (2024). Ello, debido a que, "[l]a tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz". *Ortiz Ortiz v. Medtronic,* 209 DPR 759, 778-779 (2022), citando a *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 771 (2013). Después de todo, es el juzgador de los hechos o el jurado

---

[23] Como regla general, en un procedimiento de desahucio, por ser sumario, no se dilucidan conflictos relacionados a la titularidad del bien arrendado. Esto es debido a que solo se desea recobrar la posesión del inmueble por quien tiene derecho a ella. *C.R.U.V v. Román,* 100 DPR 318, 321 (1971), citando a *Negrón v. Corujo,* 67 DPR 398, 403 (1947) y *Escudero v. Mulero,* 63 DPR 574, 584 (1944). Además, responde al interés del Estado en atender expeditamente el reclamo de un dueño de un inmueble porque su derecho a poseer y disfrutar de sus bienes ha sido interrumpido. *Adm. Vivienda Pública v. Vega Martínez,* 200 DPR 235, 240 (2018), citando a *ATPR v. SLG Volmar-Mathieu,* 196 DPR 5, 9 (2016).

quien escucha la prueba testifical y evalúa el comportamiento de los declarantes. *Pueblo v. Negrón Ramírez,* supra.

De conformidad, el Tribunal Supremo de Puerto Rico ha resuelto que, los tribunales apelativos intervienen con la apreciación de la prueba cuando: (1) el apelante demuestra la existencia de pasión, prejuicio, parcialidad o error manifiesto; o (2) si la apreciación de la prueba no concuerda con la realidad fáctica o esta es inherentemente imposible o increíble. *Pueblo v. Negrón Ramírez,* supra. A esos efectos, la parte que impugne la apreciación de la prueba es la parte encargada de señalar y demostrar la base para la intervención apelativa. *Pueblo v. Cabán Torres,* 117 DPR 645 (1986).

Con tales fines, y en la medida en que el juzgador de los hechos no está exento de equivocaciones, dicha parte habrá de presentar y reproducir la transcripción de la prueba oral. *Pueblo v. Pérez Delgado,* 211 DPR 654, 672 (2023). La ausencia de la transcripción imposibilita que responsablemente los foros revisores puedan descartar la apreciación razonada y fundamentada de la prueba que realizó el juzgador de los hechos. *Íd.*, a la pág. 674.

Por otro lado, la Regla 110 (a) de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 110(a), dispone que "el peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por alguna de las partes". A su vez, en los casos civiles, la Regla 110(f) de las Reglas de Evidencia, 32 LPRA Ap. VI, R.110(f), establece que "la decisión de la juzgadora o del juzgador se hará mediante la preponderancia de la prueba a base de criterios de probabilidad, a menos que exista disposición al contrario". Cónsono con lo anterior, el Tribunal Supremo ha resuelto que, [d]e ordinario, el *quantum* de prueba necesario para prevalecer en el ámbito administrativo es el de preponderancia de la prueba". *OEG v. Martínez Giraud,* 210 DPR 79, 93 (2022).

**III.**

El apelante sostiene que, el TPI incidió al desestimar la demanda de desahucio sumario y, a su vez, al resolver otras causas de acción no autorizadas ante la desestimación de la reconvención. En particular, sostiene que, el foro primario no actuó correctamente al imbricar asuntos atinentes al pago de las cuotas de mantenimiento, la interrupción del servicio de electricidad entre otros, con la acción de desahucio sumario. A su entender, el juzgador de los hechos falló en su apreciación de la prueba al determinar que, la intención de las partes era extender la vigencia del arrendamiento y opción a compra hasta el 30 de mayo de 2025. Por su estrecha relación atenderemos los errores planteados en conjunto.

En este caso, no está en controversia que, según las determinaciones de hechos del foro primario, el señor Mancera, la señora Sortillón y la sociedad legal de gananciales entre ellos, son los titulares de la Suite 702 del Centro Internacional de Mercadeo I en el Municipio de Guaynabo. De la *Sentencia* recurrida, se desprende, además que, el matrimonio Mancera-Sortillón suscribió un contrato de arrendamiento el 1 de febrero de 2021 con DMS por conducto representativo del señor Schmitt.[24] La extensión original del contrato era de dos años: desde el 15 de febrero de 2021 hasta el 15 de febrero de 2023. Las partes pactaron que, el canon de arrendamiento mensual sería por la cantidad de $2,500.00, pero el importe correspondiente al primer año debía realizarse mediante un pago englobado de diez meses; no era necesario pagar los dos meses restantes, lo cual resultaba en una suma total de $27,500.00 correspondiente al primer año de arrendamiento. El arrendatario podía escoger si englobaba su pago en el segundo año del arrendamiento, lo cual se realizaría bajo los mismos términos.

---

[24] Apéndice, págs. 136-141.

Conforme la apreciación de la prueba realizada, el foro primario determinó que, el 11 de febrero de 2022, las partes pactaron un contrato de opción de compraventa sobre la propiedad sujeto al arrendamiento. Estos fijaron un precio de venta de $275,000.00, a los cuales DMS abonó $11,000.00.[25] Subsiguientemente, el 14 de febrero de 2023, se extendió el término del contrato de arrendamiento con opción de compraventa hasta el 15 de febrero de 2024 mediante un documento titulado *Addendum al contrato de arrendamiento* que establece que el arrendamiento finalizaría "***on or before* May 30th 2025** [sic] with an option to purchase at the price of $275,000." (Énfasis nuestro).[26]

Se desprende del contrato de arrendamiento que el señor Mancera pagaría las cuotas de mantenimiento y las utilidades (solo el agua y la luz).[27] El pacto puntualizaba que, el atraso mayor de 30 días en el pago del canon facultaría al señor Mancera a resolver el contrato.[28] En su dictamen, el TPI destacó que, el contrato y el *addendum* son válidos y a pesar de que, el *addendum* hace referencia a dos fechas, el tribunal apreció de la prueba admitida y creída que, el acuerdo de arrendamiento con opción a compra tiene una vigencia hasta el 30 de mayo de 2025. De su evaluación de la totalidad de la prueba concluyó que, DMS no le adeuda dinero al señor Mancera, por lo que, no se configuró una reclamación por falta de pago. El presunto incumplimiento de pago imputado resultó porque DMS se ha visto compelido a incurrir en el pago de cuotas de mantenimiento (para evitar mayor interrupción en el servicio de electricidad), que corresponden al señor Mancera.

El apelante cuestiona las determinaciones de hecho y conclusiones de derecho consignados por el foro primario. Arguye

---

[25] Apéndice, pág. 10.
[26] *Íd.*
[27] Apéndice, pág. 5.
[28] *Íd.*

que, el TPI cometió un error manifiesto al no considerar los pagos atrasados de los cánones de arrendamiento. En su recurso expuso que, a los apelados no pagar cánones del contrato de arrendamiento, la parte apelante no pagó el mantenimiento a partir de julio de 2024 y al tener varios atrasos entonces es que el edificio cortó los servicios de energía y de acueductos y alcantarillados. Sostuvo que, ejerció su derecho a no renovar el contrato conforme la cláusula 17 del contrato.

En atención a la postura esbozada por el apelante y en aras de ejercer adecuadamente nuestra función revisora, ordenamos al foro primario emitir una resolución fundamentada, particularmente sobre la evaluación de la prueba a la luz de la cláusula 17 del contrato. Mediante su *Comparecencia Especial* presentada el 24 de abril de 2025, el foro primario expuso que, evaluó el testimonio del señor Mancera, así como el *exhibit* 3 que corresponde a una comunicación que cursaran el apelante y la señora Sortillon, a través de su abogado, a la corredora de bienes raíces. Destacó que, en la última oración del tercer párrafo de la comunicación se establece que, con relación a la propiedad estos informan que no venden su propiedad. Sin embargo, a su entender la cláusula 17 del contrato de arrendamiento versa sobre la renovación automática del contrato. Aquilatada la prueba ante su consideración, el juzgador de los hechos determinó que, no identificó una cancelación del acuerdo de arrendamiento. Expuso que, por el contrario, las partes mediante *addendum* extendieron la vigencia del contrato hasta el 30 de mayo de 2025.

El apelante plantea que, el foro primario erró en la apreciación de la prueba y argumenta en detalle su postura basada en su versión de los hechos. Observamos que, mediante una moción instada en reacción a la *Comparecencia Especial,* el apelante levanta por primera vez, un señalamiento sobre la presunta ausencia de

firmas en el *addendum* del contrato en controversia. Al reaccionar sobre los referidos planteamientos, los apelados destacaron que, dicha aseveración es falsa y contraria a lo vertido para récord tanto testimonial como documental. Ello, porque surgen las firmas en el *addendum* y el asunto nunca fue objeto de controversia ni se presentó alegación alguna en alguna etapa procesal anterior.

Luego de un análisis del expediente ante nuestra consideración constatamos que, en efecto, los planteamientos sobre la presunta falta de firmas en el *addendum* al contrato no fue un asunto presentado ante el TPI.  Añádase a ello que, surge del informe de manejo del caso, la minuta de la vista en su fondo, así como del registro general de evidencia (preparado por la secretaria de servicios a sala) dicha pieza evidenciara fue anunciada y presentada por el propio apelante y no surge cuestionamientos sobre presunta falta de firmas en el récord judicial. Ante ello, nos resulta evidente que el cuestionamiento sobre las firmas en el *addendum*, traído en una moción posterior a la radicación del recurso de apelación resulta tardío y no corresponde al cuadro fáctico demostrado en el expediente. Es norma vigente que, en apelación nos abstenemos de adjudicar cuestiones que no han sido atendidos en primera instancia, ante el foro judicial o el foro administrativo.[29]

En relación con los señalamientos de error sobre la apreciación de la prueba y aplicación del derecho aplicable, colegimos que, el TPI correctamente justipreció la prueba admitida ante su consideración y no incidió en su análisis. Basado en un ejercicio concienzudo de su apreciación de la totalidad de la prueba testifical y documental consignó los citados hechos que la parte apelante no ha logrado impugnar.  Además, no incurrió en error manifiesto en el análisis del caso y controversia ante su consideración.

---

[29] *Trabal Morales v. Ruiz Rodríguez*, 125 DPR 340, 351 (1990).

Cabe destacar que, el apelante no proveyó una transcripción de la prueba oral en este caso. Conforme la normativa antes expuesta, la parte que impugne la apreciación de la prueba es la parte encargada de señalar y demostrar la base para la intervención apelativa. La ausencia de la transcripción impide que los foros revisores puedan descartar la apreciación razonada y fundamentada de la prueba que realizó el juzgador de los hechos y mucho menos, de esta forma, logra derrotar la presunción de corrección del dictamen judicial. Establecido lo antes, colegimos que, el apelante no logró establecer por una preponderancia de la prueba, la procedencia de la acción de desahucio por falta de pago.

Ahora bien, al entender sobre el aspecto procesal de este caso es preciso señalar que, el TPI ordenó la desestimación de la reconvención instada por los apelados. En su consecuencia, el foro primario debió limitar sus determinaciones de hechos y conclusiones de derecho a los asuntos atinentes al desahucio sumario por falta de pago, sin entretener asuntos atinentes al contrato de opción de compra y lo relacionado a los causales de cobro de dinero y otros incluidas en la reconvención. Al así hacerlo, incidió en su proceder. Sobre este particular, le asiste la razón al apelante, por lo que, procede dejar sin efecto todas las determinaciones de hecho relacionadas o expresiones del foro primario que de alguna forma incidan en el contrato de opción de compra, así como sobre la acción de cobro de dinero en contra de la parte apelante. Lo antes, sin perjuicio de proceso ulterior mediante un pleito independiente, si alguno.

**IV.**

Por todo lo antes confirmamos la sentencia apelada, únicamente sobre la denegatoria del desahucio sumario y revocamos, en parte, el dictamen apelado correspondiente a la reconvención, que fue previamente desestimada por el foro primario.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones